The first of the argued cases is Dickson v. Saul. We've set it for 10 minutes per side. Mr. Caldwell, I believe you go first. Thank you, Judge Fletcher. And may it please the court, my name is Mark Caldwell. I'm standing for Ms. Dickson this morning. She applied for Social Security disability benefits based on her earnings record, based on payroll taxes she paid throughout her working career. I'll keep track of my own time, but I do intend to try to reserve two minutes for rebuttal. Okay, we'll try to help. Thank you. I've seen a lot of attorneys talk right through it. Okay, well, we'll try to help. Go find our way. This case, I believe, is not a complicated case. I believe it can be simplified. And it can be simplified based on the opinions of the two treating doctors under the legal standard that states treating physician opinions are entitled to deference. We have two treating doctors in this case. We have Laura Froelich, a psychologist. And she gave an assessment that led to uncontradicted vocational expert testimony that a person with those limitations would not be able to work. We have a treating psychiatrist, Laura Sherman. And the vocational expert did not have to give testimony based upon her limitations because the ALJ interrupted and said, if I were to accept that, I would concede that that person could not work. So once those two opinions are credited, an ALJ would have to find Ms. Dixon disabled. Now, what did the ALJ do to discount the opinions of those treating doctors? And he put them together. He said, these are the same reasons for both doctors. Well, he said, Dr. Sherman's treatment records show things like she was cooperative. She was oriented. Oriented just means, you know, where you are, what day it is, and who you are. She had logical processes. She had no paranoia. And the list goes on. All of those findings deal with someone who has a thought disorder. A thought disorder is, to put it in layman terms, someone with scrambled thinking. And those kinds of folks are people who have schizophrenia. They have delusions. They have hallucinations. I believe the ALJ mentioned those as well. But what did the ALJ say were the severe impairments in this case? Two, major depressive disorder, and generalized anxiety disorder. So the question arises, how do you take findings that deal with a thought disorder and use those findings to discredit the severity of a person who suffers from symptoms related to entirely different diagnoses, major depressive disorder and anxiety disorder? And the answer to that question is, you don't. Because there's no connection between that long list that the ALJ provided. He used the same list several times throughout his decision in major depressive disorder and generalized anxiety disorder. The commissioner does something very interesting in the response brief. The commissioner refers to ALJ rationale is expressed, and I quote, with less than ideal clarity. And asks this court to somehow look at those list of findings that the ALJ gave and infer that somehow, even though the ALJ's decision was expressed with less than ideal clarity, those findings are a basis to detract from the severity of mental depressive disorder, major depressive disorder, and generalized anxiety disorder. But here's the strange thing about the commissioner's brief. The commissioner's brief says, this court cannot substitute its judgment for that of the ALJ. The commissioner can't have it both ways. Either this court takes it upon itself to infer some sort of reasoning behind the ALJ's list of symptoms, or this court cannot substitute its judgment for the ALJ, but it can't do both. And so the commissioner is asking this that the commissioner says this court is not allowed to perform. Mr. Caldwell, may I ask you, suppose we agree with you that the ALJ erred in not crediting Dr. Folek and Dr. Sherman's opinions. What is the appropriate remedy? Because ordinarily we remand for further proceedings. You've asked us to remand for an award of benefits. That's something reserved for very rare cases. Why is this a case in which would be appropriate? Well, I'm going to give two answers if I may. And the first one is, I know some courts say this is a rare remedy. I can only say that disability determinations are not the result of a democratic vote. It's not how many times any remedy should be granted or denied. It's whether a remedy is appropriate under the facts of any individual case. With that editorial comment to one side, there is nothing to resolve upon further administrative proceedings. My favorite case, of course, being the garrison case where the agency asked for just that. And this court said no useful purpose would be served by remand for further proceedings. And that's the case here because the only evidence that is juxtaposed with the treating doctor's opinions is the evidence from consultative examiners and one state agency doctor who never laid eyes on Ms. Dixon. But even those are very unhelpful. The ALJ had... Counsel, I mean, that's not entirely correct because there's evidence in the record from your client that was recorded in medical records about her activities in life. And so the a disability finding would be inconsistent with the daily activities that she's engaging in. So how is that not evidence of record that needs to be addressed? It's... You're right about the first part in the fact that the ALJ listed activities, but just like my answer to Judge Miller's question, the ALJ did not provide a connection between the evidence cited and the daily activities that the ALJ here relied upon. The ALJ can rely upon activities in two circumstances. One, where they are transferable to the ability to perform sustained work. And two, where they are at odds with the claimant's reported symptoms and the ALJ provided neither in this case. I would like to keep my promise to reserve two minutes. May I do so? Yes, you may, unless there are other questions from the bench at this time. We'll make sure you get a chance to say what you need to say. So if there are more questions from the bench now, we'll hear them now or we'll wait. As the court wishes. Okay. Let's hear from the other side and you've saved some time. Thank you, Judge. Good morning, Your Honors. Elizabeth Feer on behalf of the Commissioner of Social Security, Andrew Saul. I would like to start out by disagreeing with my opponent about the relevance of the normal mental status findings that the ALJ relied upon. The claimant at the hearing testified that part of why she couldn't work was because she has these anxiety attacks that cause, that make, she says, I can't think real good. Then as the ALJ outlines in the decision on starting on page 21, claimant says that her impairments interfere with her ability to cognitive sort of leaning factors that the ALJ properly relied on. When you have a claimant who's saying that her anxiety attacks and depressive symptoms, which we all agree that she has, interfere with her ability to think. She's said that on multiple occasions. So it's not inappropriate for the ALJ to rely on those normal findings that exist pretty amply throughout the two treating sources who issued very extreme limitations. They both found that the claimant was moderately limited in her ability to understand simple tasks, but then they found marked and extreme findings in every other category. So when you have someone where the doctors are saying that that's how limited the claimant is, and yet their own examination findings show all of these normal things, that's the kind of conflicting evidence that the ALJ was entitled to rely on. And he did so appropriately in this case. So both doctors really made findings that were very, very similar. And if you look at both of their treatment records, Dr. Froelich in particular almost never did any mental status examination findings. And if you at what's discussed during those treating sessions, it's about the claimant's problems with her family life. She's going through a divorce. She has sons that are in trouble with the law. But those aren't medical conditions. To be disabled under the Social Security Act, you have to be medically disabled. So we agree that this claimant has these two severe mental conditions, anxiety and depression. But she stopped working because she stole something. And that's all over the record. She admits that to several doctors that that's why she stopped working. So that's not a medical reason. And yet she also says throughout the record over and over again that she's always been a nervous person, a high-strung person, a panicky person. So she was able to work for many, many years with those same symptoms. Nothing changed except her family life got intense. And we can sympathize with her very much, but that's not a medical condition that's preventing her from working. And you can see that when you look at all of the other actual examination findings. She does well on the mental status examination findings. She often is tearful when she's at these treatment sessions. But even with that sort of anxiety, her mental status findings are very largely normal throughout the record. And that's with Dr. Froelich, Dr. Sherman, when she started treating with Southwest Behavioral later on. And then there's three different psychiatric consultative examinations. And Dr. Wenz is the very last one in the record. That's in February 2016. And Dr. Wenz didn't assess any real mental limitations. And then I would also ask you to look at some of her other treatment records. She's not alleging anything but the mentals here, but she does have a lot of primary care treatment at Buckeye. When she's treating there for her gastrointestinal symptoms. And you don't see any of this elevated anxiety described in any of those treatment records. And the mental status findings there because the doctors did more comprehensive evaluations are largely normal there as well. But those doctors are essentially looking at physical things. Let me ask you this. It appears to me that much of what you're relying on is in the records and sort of diagnostic records of her two treating doctors to contradict the treating doctor's conclusions. That's a little tricky because the treating doctor concludes X, but you're saying the treating doctor's own records contradict the conclusions that they reach. And because this is a question of degree rather than an on-off switch, I have trouble seeing how we can use the doctor's own reports to impeach the doctor's conclusions. Can you help me with that? Your Honor, you have several cases that say that. I'm sure there's some in our brief, but I cannot think of one off the top of my head right now. But there are several cases from this circuit that say an ALJ may use the inconsistency between a doctor's own records. Oh, I think you're quite right as a matter of law. But I'm looking at these particular doctors, and what we have here really is a question of degree rather than an on-off switch. So they're saying the degree is pretty high, high enough to make her disabled. And they are, but their records don't support that. And one of the ways in which a treating source's opinion would be entitled to greater weight is if it's supported. The forms that the doctors filled out have no support on them whatsoever. And in fact, one of them actually says I think that the symptoms went far in the past when she was actually still working. But then you look at the other doctors who examined her. You have the three consultative examiners, Dr. Stafford, Dr. Mansfield, Blair, and Dr. Nguyen, and they all performed these consistent with what's in the treatment records from Drs. Sherman and Froelich. So I'm not sure if that's answering your question, though. The simple answer is that an ALJ is allowed to look at those treatment records independently. In fact, he has to look at the record as a whole and say what's in these records does not support these extreme findings. And if you really look at, I mean, they are saying she's extremely or markedly limited in every category. And yet that is just that degree, as you're saying, of limitation doesn't come through in the treatment records. Okay, thank you. Does that answer your question? And so the ALJ properly relied on the inconsistencies between the doctor's own findings and their extreme limitations. And then he also properly relied on the two of the consultative examiners, Mansfield, Blair, and Nguyen, and the two state agency doctors, Dr. Salk and Dr. Fair. And Dr. Stafford was the first CE, and he did assess a limitation. He said that the claimant would be significantly limited in her ability to complete a workday. But then Dr. Salk, who is the state agency doctor who looked at her case at the initial stage, and on page 68, he goes into detail about why that's not supported by either her work history, her activities of daily living, or the fact that there aren't other marked limitations elsewhere in that doctor's own assessment. So the ALJ gave the most weight to Dr. Mansfield-Blair, and her limitations are consistent with the RFC, which is for simple tasks, simple instructions and tasks, no consistent interaction with the public, and then no dealing with any kind of customer complaint. So if you look at what claimant's allegations are, those limitations satisfy them. And claimant is able to do many, many activities of daily living that are inconsistent with her assertion that she's so extremely limited by panic and anxiety and depression that she can't leave her house on a regular basis. I mean, she's going to yard sales, which is something that you're going to encounter strangers. She is limiting her abilities, but the RFC is limited too. And the two jobs, housekeeper and janitor, are jobs that you can perform in relative isolation. So that's also accounting for the particular symptoms that this woman has. Back to her activities, she is doing things outside of the house. She goes to court with her son on multiple occasions. She's done things that she says her stress level makes her thinking sort of go awry, and yet she applied for her state retirement benefits. She did her own taxes. She is doing things, she's learned how to do Facebook, that are inconsistent with these very extreme limitations that her doctors assessed based on what she has complained of. So we believe that the ALJ provided the adequate reasoning that the court can find the path between his and we ask you to uphold the ALJ's decision. Okay. Thank you. Thank you very much. Mr. Caldwell, you have saved some time. Oh, for another 10 minutes. Okay. Look, she stopped working because she tried to shoot herself. So let's get that straight. She, the ALJ depended on Dr. Mansfield, and that's the only evidence the ALJ said was accorded great weight. What did Dr. Mansfield say? She may have some difficulties dependent upon that are variable. Dr. Mansfield said nothing that supports the ALJ decision as written. It's simply a misrepresentation of what the agency doctor had to say. I believe the case that Ms. Furrer was trying to remember is Ghanim, G-H-A-N-I-M. And that's a helpful case because it says an ALJ may rely on a claimant's activities if they are greatly at odds, or I think the words are in the case, to a large extent based upon a claimant's activities. And there's no indication in this case that would support relating the findings of Ghanim to the facts of this case. And the Buck case is also helpful there because it talks about the specific evaluation of mental impairments and how a claimant's statements are the primary basis for doing so. And then what's important that we heard over and over again are mental status examinations. And what is a mental status examination? We've gone to great lengths in our brief to explain that a mental status examination is a brief screening device that clinicians use to detect cognitive impairments. And so once again, we have no connect between the evidence relied upon and the conclusion reached. I see I'm over my time. I would be happy to answer any questions, but otherwise I submit. Okay. Any other questions from the bench? No, thank you very much. Thank both sides for your arguments in this case. Dixon versus Saul is now submitted for decision. Thank you, counsel. Thank you. Thank you.
judges: W. Fletcher, Miller, Hunsaker